# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
ANTWON J. BLAKENEY,           )
                              )
            Plaintiff,        )
                              )
     v.                       )       1:17CV563
                              )
NORFOLK SOUTHERN RAILWAY      )
COMPANY,                      )
                              )
            Defendant.        )
```

## **MEMORANDUM OPINION AND ORDER**

This case comes before the Court on Defendant's Motion to Compel Physical Examination of Plaintiff (Docket Entry 30). Because the Court does not find the requisite "good cause," Fed. R. Civ. P. 35(a)(2), it will deny the instant Motion.

## INTRODUCTION

Plaintiff commenced this action by filing a Complaint against Defendant under the Federal Employer's Liability Act, 45 U.S.C. §§ 51 et seq. (See Docket Entry 1.) According to the Complaint, "on May 10, 2016 while employed as a Truck Driver/Track Laborer for Defendant . . ., Plaintiff fell to the ground with great force while removing a Fifty (50) pound heavy steel hydraulic spike hammer from the rear tool bed and compartment of [his] assigned gang truck." (Id. at 2.) The Complaint attributes Plaintiff's fall to the negligence of Defendant (see id. at 2-3) and alleges that the fall caused "serious, painful and permanent injuries to [Plaintiff's] head, neck, back, shoulder and related body parts,

[as well as] psychological injuries" (id. at 4).  These injuries allegedly "caused [Plaintiff] to undergo medical treatment, psychological treatment, diagnostic tests, physical therapy, use of necessary medications, MRI's[,] FCE's, and x-rays, [as well as] surgery to try and limit the pain and discomfort and limitations[,] and will require future medical treatment."  (Id.; see also id. ("Plaintiff . . . will in the future be caused to expend further great sums for medical treatment.  Plaintiff . . . will in the future have pain, suffering and mental anguish as a result of Defendant's negligence.  Plaintiff's ability to work, labor, and enjoy the normal pursuits of life has been impaired and lessened . . . ." (paragraph number omitted)).)  Defendant answered and admitted that Plaintiff fell while in its employ, but denied his allegations of negligence and injury.  (See Docket Entry 10 at 2.)

Discovery began on or about October 18, 2017 (see Text Order dated Oct. 18, 2017 (adopting Certification and Report of Joint Rule 26(f) Conference and Discovery Plan ("Discovery Plan") (Docket Entry 12)); see also Docket Entry 12 at 1 ("[Federal] Rule [of Civil Procedure] 26(a)(1)(A) Initial Disclosures shall be exchanged on October 31, 2017.")), and closed on August 30, 2018 (see Text Order dated July 2, 2018).  Since January 22, 2018, the parties have known that any trial would occur during the April 2019 Civil Master Calendar term.  (See Docket Entry 14.)

The Discovery Plan proposed by the parties and adopted by the Court mandates "[s]upplementations under [Federal] Rule [of Civil Procedure] 26(e) . . . within a reasonable time upon learning that a disclosure or response to a discovery request is incorrect or incomplete in some material respect." (Docket Entry 12 at 2.) It also authorizes, "if necessary, depositions of expert witnesses, including treating doctors, [to] be taken outside the discovery period by stipulation of the parties or by order of the Court on good cause shown no later than 21 days prior to trial." (Id.)[1]

In addition, pursuant to the Discovery Plan, Plaintiff and Defendant had to serve any expert disclosures under Federal Rule of Civil Procedure 26(a)(2)(B) and (C) by March 30 and April 30, 2018, respectively. (See id.; see also id. (allowing Plaintiff until May 30, 2018, to serve rebuttal expert disclosures).) On June 25, 2018, Defendant confirmed that it did "not anticipate introducing expert testimony from any retained expert. . . . [H]owever, [it] reserve[d] the right to introduce expert testimony from any of the treating physicians identified . . . in Plaintiff's expert disclosures . . . relate[d] to their treatment and care of [him] and their knowledge and opinion of his medical condition." (Docket Entry 35-1 at 2; see also id. ("[T]his letter constitutes notice

---

[1] Defendant's Reply overlooks the above-quoted authorization of depositions beyond the discovery deadline in arguing that "no depositions can be taken following the close of the discovery period" (Docket Entry 36 at 8 (emphasis omitted)).

-3-

that [Defendant] may also call any of the non-retained experts identified by Plaintiff on topics identified by Plaintiff.").)

On October 24, 2018, Defendant notified Plaintiff that it "intend[ed] to move under [Federal] Rule [of Civil Procedure] 35 and Local Rule 26.1(e) for an order requiring [him] to submit to a physical examination by one or more physicians sometime in the early part of [2019]." (Docket Entry 32-4 at 1; see also id. (seeking Plaintiff's consent).) After several follow-up inquiries by Defendant about whether Plaintiff would agree to a physical examination (see Docket Entry 36-1 at 2-6), on December 4, 2018, Plaintiff requested information about how Defendant "plan[ned] to use th[e physical examination] report" (id. at 2). Defendant promptly responded that it "would expect to use the [physical examination] report at trial as provided and allowed under the [Federal] Rules of Civil Procedure and Local Rules." (Id.) Plaintiff immediately asked: "[W]ould [Defendant] present the [physical examination report] through the medical [examiner] subject to cross?" (Id. at 1.) Two days later, Defendant answered that it "would expect to be able to present the [physical examination] report through testimony of the examining doctor (who would of course be subject to cross) and/or [to] use the report to cross-examine any medical witnesses called by [ P]laintiff." (Id.) On January 13, 2019, Plaintiff declined to consent to a physical examination. (See Docket Entry 36-2 at 1.)

Defendant filed the instant Motion on January 29, 2019. (See Docket Entry 30; see also Docket Entry 31 (Brief in Support).) Plaintiff has responded in opposition (see Docket Entry 35) and Defendant has replied (see Docket Entry 36).

DISCUSSION

The instant Motion asks "this Court to order the physical examination of Plaintiff [] prior to trial." (Docket Entry 30 at 1; see also id. at 2 (describing proposed examiner as "board-certified in occupational medicine" with "over 25 years of experience in occupational medicine").) "The court where the action is pending may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner," Fed. R. Civ. P. 35(a)(1); however, "[t]he order . . . may be made only on motion for good cause," Fed. R. Civ. P. 35(a)(2) (emphasis added); see also M.D.N.C. LR 26.1(e) ("For good cause appearing therefor, the physical or mental examination of a party may be ordered at any time prior to trial."). Although generally "[a] plaintiff in a negligence action who asserts mental or physical injury places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury," Schlagenhauf v. Holder, 379 U.S. 104, 119 (1964) (internal citation omitted), "[t]he ability of the movant to obtain the desired information by

other means is also relevant," id. at 118; see also Equal Empl't Opportunity Comm'n v. Maha Prabhu, Inc., No. 3:07CV111, 2008 WL 2559417, at *2 (W.D.N.C. June 23, 2008) (unpublished) ("[[T]he part[y moving for a physical or mental examination] must show necessity . . . . [G]ood cause does not exist where the desired information could have been obtained through less invasive tools of discovery. Thus, necessity arises where . . . other means of obtaining information [about a party's alleged injuries] are exhausted." (internal citation omitted)).

The instant Motion argues that good cause supports Defendant's request for a physical examination of Plaintiff because:

> The testimony of Plaintiff and his treating physicians, given at discovery depositions between May and July 2018 (at least nine months before the scheduled trial date), indicates that Plaintiff _may_ still be undergoing additional medical treatment and his medical condition _may_ still be changing. Therefore, by the time of trial, his medical condition likely will not be accurately reflected in the medical records and testimony previously provided during discovery.

(Docket Entry 30 at 2 (emphasis added); see also Docket Entry 31 at 4-5 ("Plaintiff and his treating physicians have testified regarding his physical condition and treatment, but that testimony will be at least nine months out-of-date by the time of trial. Furthermore, . . . Plaintiff was still seeking and receiving additional treatment for his alleged injuries at the close of discovery, and at least one of his treating physicians acknowledged that his physical condition could change prior to trial. As a

result, the medical records and testimony obtained during discovery will not be sufficient to show [his] physical condition at the time of trial.").)  As support for the foregoing assertions, Defendant's Brief in Support of the instant Motion discusses (and attaches excerpts from the transcripts of) the depositions of Plaintiff and two of his doctors (Durwin Brooks and Eliot Lewit).  (See Docket Entry 31 at 2-3 (referencing Docket Entries 32-1, 32-2, 32-3).)

In the attached transcript excerpts from his deposition on May 1, 2018, Plaintiff testified that:

1) Dr. Brooks "recommended surgery but [said] that [Plaintiff] didn't have to have it right [then]" (Docket Entry 32-1 at 2);

2) Plaintiff "just had a MRI . . . and [needed] to go back to talk to Dr. Brooks about it" (id. at 3); and

3) "to address [Plaintiff's] headaches," Dr. Lewit prescribed "medication" and, "every two . . . [or] three months," Plaintiff had been and was "currently seeing [Dr. Lewit]" (id. at 4).

The attached transcript excerpts from Dr. Brooks's deposition (on June 12, 2018), in turn, reflect that:

1) on April 4, 2018, Dr. Brooks saw Plaintiff for the first time in "a little over a year," to "follow[] up with neck and right arm pain 23 months out from his injuries" and to "follow[] up about his back pain as well" (Docket Entry 32-2 at 2-3);

2) Plaintiff's "clinical exam still did not show signs of myelopathy" (id. at 4;[2] see also id. (recounting Plaintiff's "normal gait pattern," as well as "unequivocal Babinski, negative Hoffman sign, no clonus, [and] five out of five strength"));

3) nonetheless, Dr. Brooks "ordered [an MRI of Plaintiff's] cervical [spine] to reevaluate . . . cord signal change" (id. at 5);

4) Dr. Brooks also "ordered . . . [an MRI of Plaintiff's] lumbar [spine] because he was having increasing radicular right leg pain" (id.; see also id. ("[Plaintiff] has a pars defect and nerve compression, so [Dr. Brooks] wanted to evaluate that as well."));[3]

5) upon review, Dr. Brooks did not "note in these new lumbar and cervical MRIs . . . any significant differences from [Plaintiff's] previous MRIs" (id. at 6); and

---

[2] "Myelopathy is a 'disorder of the spinal cord.'" Laberge v. Berryhill, No. 18CV257, 2018 WL 6819328, at *2 n.1 (D.N.H. Dec. 28, 2018) (unpublished) (internal brackets omitted) (quoting Stedman's Medical Dictionary 1270 (28th ed. 2006)).

[3] "A pars defect of the lumbar spine involves a part of a vertebra called the pars interarticularis (meaning the part between two joints) and refers to a break in that portion of bone that leads to a separation of the upper, front portion of the vertebra from its lower, back portion. It is a precursor to spondylolisthesis." Velasquez v. Wexford Health Sources, Inc., Civ. No. 16-1807, 2017 WL 4151278, at *4 n.7 (D. Md. Sept. 19, 2017) (unpublished); see also Batista v. Commissioner of Soc. Sec., No. 16CV3629, 2018 WL 4964102, at *7 n.18 (E.D.N.Y. Oct. 15, 2018) (unpublished) ("Spondylolisthesis is a slipping of vertebra that occurs, in most cases, at the base of the spine.").

-8-

6) when Dr. Brooks saw Plaintiff on May 9, 2018, Plaintiff again "express[ed] sort of the same fears about . . . having fusion surgery at his age" (id.), so Dr. Brooks "recommended [Plaintiff] go see Dr. Dumonski" (id. at 7; see also id. at 7-8 ("[Dr. Brooks's] current plan was [for Plaintiff to get a] second opinion, and then he was going to come back and see [Dr. Brooks]. . . . [However, Dr. Brooks] d[id]n't even know if [Plaintiff had] gotten approval for the second opinion yet.")).

Lastly, the attached transcript excerpt from Dr. Lewit's deposition on June 27, 2018, features this testimony:

1) at an office visit, Plaintiff reported that "he felt his milder headaches were more frequent" (Docket Entry 32-3 at 2); and

2) "[h]eadaches, by their very nature, are variable" (id.; see also id. ("That's always the case. . . . Now, why the variability isn't entirely clear. That may go to exacerbating factors to some extent, [like] . . . weather changes. Stress is the number one thing that tends to exacerbate headaches of any kind . . . . Sometimes patients will deny anything different going on in their lives and the headache just fluctuates and worsens. It's . . . just the nature of the disorder.")).

This showing does not establish good cause for the requested physical examination. As an initial matter, the record material cited by Defendant does not support its core thesis, i.e., that, "by the time of trial, [Plaintiff's] medical condition likely will

-9-

not be accurately reflected in the medical records and testimony previously provided during discovery" (Docket Entry 30 at 2 (emphasis added)).  In that regard, Dr. Brooks's testimony (detailed above) indicates that (1) clinical testing of Plaintiff performed more than a year after his last prior appointment "<u>still</u> did not show signs of [a spinal cord disorder]" (Docket Entry 32-2 at 4 (emphasis added)), (2) subsequent MRIs of Plaintiff's cervical and lumbar spine revealed no "significant differences from his previous MRIs" (<u>id.</u> at 6), and (3) further discussion between Plaintiff and Dr. Brooks did not alter Plaintiff's long-standing "fears about . . . having fusion surgery at his age" (<u>id.</u>).  In other words, two years after Plaintiff's fall on the job, Dr. Brooks found (through both physical examination and advanced diagnostic technology) that Plaintiff's spine-related conditions had remained stable for at least a year and that his ambivalence about surgical options likewise had not changed.  Given that static history, the mere fact that Dr. Brooks referred Plaintiff for a second opinion (which he may or may not have pursued) (<u>see</u> <u>id.</u> at 7-8)[4] simply does not warrant the conclusion that, "by the time of trial, his medical condition <u>likely</u> will not be accurately reflected in the medical records and testimony previously provided during discovery" (Docket Entry 30 at 2 (emphasis added)).

---

[4] According to Plaintiff's Response, he "has not seen or treated with [Dr. Dumonski]."  (Docket Entry 35 at 6.)

Similarly, no such conclusion reasonably could rest on Defendant's (above-discussed) evidence of Plaintiff seeing Dr. Lewit on a roughly quarterly basis for treatment of headaches (see Docket Entry 32-1 at 4) and of Plaintiff (in one such visit) reporting that "his milder headaches were more frequent" (Docket Entry 32-3 at 2 (emphasis added)), particularly given Dr. Lewit's explanation that "[h]eadaches, by their very nature, are variable" (id.), that variability "always" accompanies headaches (id.), that conditions as ephemeral as "weather changes" and "[s]tress" regularly "exacerbate headaches" (id.), and that, even absent any apparent trigger, "headache[s] just fluctuate[]" (id.). To the contrary, this record material shows a consistent pattern of Plaintiff seeking routine care for a condition that, by its "very nature" (id.), often (and inexplicably) varies, but as to which (as far as the evidence indicates) he only once reported any change (and then solely as to the frequency of "milder headaches") (id.). If the Court found good cause for a physical examination based on that sort of showing, no plaintiff who complains of headaches possibly could escape a physical examination on the eve of trial. Adopting a standard with such sweeping implications would conflict with the Supreme Court's construction of the "good-cause requirement [as] not a mere formality, but [as] a plainly expressed limitation," Schlagenhauf, 379 U.S. at 118, and of "Rule 35[ as] requir[ing] discriminating application by the trial judge," id.

-11-

Accordingly, the Court sustains "Plaintiff['s] object[ion] to the [requested physical] exam as . . . no foundation as to the necessity of the exam has been specifically shown in this case" (Docket Entry 35 at 3; see also id. at 6 ("Defendant has not shown any evidence that the [existing] discovery, testimony and [medical] records are insufficient to show [P]laintiff's condition at trial . . . .")). See Schlagenhauf, 379 U.S. at 118 (holding that "good cause" standard of Fed. R. Civ. P. 35(a) requires "affirmative showing by the movant"); Maha Prabhu, 2008 WL 2559417, at *2 ("[[T]he part[y moving for a physical or mental examination] must show necessity . . . ."). Moreover, to the extent Defendant harbored concerns about material changes in Plaintiff's back condition, headaches, or other claimed injuries, mechanisms exist for Defendant to "obtain the desired information by other means [than a compelled physical examination]," Schlagenhauf, 379 U.S. at 118. To begin, as documented in the Introduction, the parties exchanged initial disclosures, including:

1) "the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment," Fed. R. Civ. P. 26(a)(1)(A)(i);

2) "a copy – or a description by category and location – of all documents[ or] electronically stored information . . . that the

-12-

disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment," Fed. R. Civ. P. 26(a)(1)(A)(ii); and

3) "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under [Federal] Rule [of Civil Procedure] 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including <u>materials bearing on the nature and extent of injuries suffered</u>," Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added).[5]

"In addition to the disclosures required by [Federal] Rule [of Civil Procedure] 26(a)(1)[(A)(i)-(iii)], [Plaintiff had to] disclose to [Defendant] the identity of any [expert] witness

---

[5] Defendant also undoubtedly served interrogatories and requests for production under Federal Rules of Civil Procedure 33 and 34, to discover not only medical evidence on which Plaintiff might rely to support his claim(s) against Defendant (the disclosure of which Federal Rule of Civil Procedure 26(a)(1)(A) already mandated), but also medical evidence that might undercut Plaintiff's claim(s) against Defendant. See generally Sherlock v. Fontainebleau, 229 F. Supp. 3d 1277, 1282 (S.D. Fla. Jan. 18, 2017) ("To be sure, a defendant is entitled to the production of medical records that have a logical connection to the [p]laintiff's claim of injuries." (internal brackets and quotation marks omitted)). Consistent with that supposition, the excerpts from Dr. Brooks's deposition transcript reveal that (during questioning by Defendant's counsel) Dr. Brooks asked Defendant's counsel if he "ha[d certain] notes" from Plaintiff's appointments on April 4 and May 9, 2018, and that (when Defendant's counsel answered in the negative) Dr. Brooks offered to "print those out" and then did so. (Docket Entry 32-2 at 2; see also id. at 2-4 (discussing notes in question, including contents that appeared to bolster defense as to severity of Plaintiff's alleged back injury).)

[Plaintiff] may use at trial," Fed. R. Civ. P. 26(a)(2)(A), as well as "a written report – prepared and signed by . . . [any witness] retained or specially employed to provide expert testimony," Fed. R. Civ. P. 26(a)(2)(B); see also id. ("The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them[] . . . ."), and, for any other expert witness (such as a treating physician), a description of "the subject matter on which the witness is expected to present evidence . . . and a summary of the facts and opinions to which the witness is expected to testify," Fed. R. Civ. P. 26(a)(2)(C) (internal subpart number omitted).[6] Further:

> ha[ving] made [his] disclosure[s] under [Federal] Rule [of Civil Procedure] 26(a) . . . [and] ha[ving] responded to an[y] interrogatory[ and/or] request for production [served by Defendant], . . . [Plaintiff had to] supplement or correct [his] disclosure or response . . . in a timely manner if [he] learn[ed] that in some material respect the disclosure or response [wa]s incomplete or incorrect, and if the additional or corrective information ha[d] not otherwise been made known to [Defendant] during the discovery process or in writing . . . .

---

[6] Notably (as detailed in the Introduction), after Plaintiff made the above disclosures (and Defendant deposed Plaintiff and Dr. Brooks), Defendant stated that it would not "introduc[e] expert testimony from any retained expert. . . . [Instead, Defendant] reserve[d] the right to introduce expert testimony from any of the treating physicians [Plaintiff] identified . . . relate[d] to their treatment and care of [him] and their knowledge and opinion of his medical condition." (Docket Entry 35-1 at 2.)

-14-

Fed. R. Civ. P. 26(e)(1).[7]  Finally, "[i]f [Plaintiff has] fail[ed] to provide information or identify a witness as required by [Federal] Rule [of Civil Procedure] 26(a) or (e), [he] is not allowed to use that information or witness to supply evidence . . . at [his] trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

To summarize:

1) Plaintiff has disclosed any witnesses and/or records that support his claims, see Fed. R. Civ. P. 26(a)(1)(A)(i) & (ii);

2) Plaintiff has disclosed his damages computation, along with "materials bearing on the nature and extent of injuries suffered," Fed. R. Civ. P. 26(a)(1)(A)(iii);

3) Plaintiff has disclosed reports explaining the testimony of any medical experts he has retained, see Fed. R. Civ. P. 26(a)(2)(B), as well as a summary of any testimony his treating physicians will give, see Fed. R. Civ. P. 26(a)(2)(C), and Defendant has declined to contest that testimony with any expert evidence of its own (see Docket Entry 35-1 at 2);

4) since making the foregoing disclosures (and responding to any discovery demands from Defendant), Plaintiff has borne an

---

[7] The Discovery Plan similarly requires "[s]upplementations . . . within a reasonable time upon learning that a disclosure or response to a discovery request is incorrect or incomplete in some material respect."  (Docket Entry 12 at 2.)

obligation to supplement them if/when they became materially incomplete or incorrect, see Fed. R. Civ. P. 26(e)(1);[8] and

5) Plaintiff may not use at trial any witness, document, damages computation (or evidence bearing thereon), and/or retained expert/treating physician testimony that he did not properly disclose (or include in a response to a discovery demand), absent substantial justification or lack of prejudice to Defendant, see Fed. R. Civ. P. 37(c)(1).

In light of those considerations, if Defendant believed Plaintiff had "receiv[ed] additional treatment for his alleged injuries [after] the close of discovery, and . . . his physical condition [had] change[d]" (Docket Entry 31 at 4), before seeking to compel a physical examination, Defendant (at a minimum) should have asked Plaintiff to supplement his disclosures and discovery responses with any new medical information (particularly given that, during the discovery period, Defendant expressed an intent to rely on testimony from Plaintiff's treating physicians in lieu of disclosing its own medical expert). Additionally, Defendant could have sought "depositions of [Plaintiff's] expert witnesses, including treating doctors, . . . outside the discovery period by stipulation of the parties or by order of the Court on good cause shown no later than 21 days prior to trial." (Docket Entry 12 at

---

[8] Plaintiff's Response acknowledges his "continual duty to supplement if there is a significant or material change in his physical or mental condition." (Docket Entry 35 at 7.)

2.)[9] Simply put, "good cause does not exist [for the requested physical examination because] the desired information could have been obtained through less invasive tools of discovery," Maha Prabhu, 2008 WL 2559417, at *2.

As a final matter, in finding good cause lacking here, the Court has carefully considered Defendant's contention that "courts and commentators agree that, in circumstances where the plaintiff's physical condition is at issue and may change between discovery and trial, a physical examination prior to trial is warranted" (Docket Entry 31 at 4 (emphasis added)). To support that contention, Defendant cited Perez v. Viens, No. 4:09CV3206, 2011 WL 855673 (D. Neb. Mar. 8, 2011) (unpublished), and 8B Charles Alan Wright et al., Federal Practice and Procedure § 2234 (3d ed. 1998 & Nov. 2018 supp.). (Docket Entry 31 at 4.) Upon review, those authorities do not entitle Defendant to a physical examination of Plaintiff.

Regarding Perez, Defendant relied on language therein "'find[ing] "good cause" exist[ed] for [a medical] exam since, based on the deposition testimony of [the plaintiff] and [his disclosed expert/physician] and the length of time since his last examination the nature of [the plaintiff's] current physical limitations are at issue and worthy of an update.'" (Id. (emphasis added) (parenthetically quoting Perez, 2011 WL 855673, at *2).)

---

[9] Defendant may take a second deposition of a previously deposed treating physician by stipulation of the parties or with leave of the Court. See Fed. R. Civ. P. 30(a)(2)(A)(ii).

However, Defendant failed to note that, in Perez, the court determined that the deposition testimony of the plaintiff and his disclosed expert/physician provided good cause for a physical examination (when combined with "the length of time that ha[d] passed since [the plaintiff's] last examination," Perez, 2011 WL 855673, at *4), because of "the differing testimony of [the plaintiff] and his [disclosed expert/]physician," id. (emphasis added). Defendant has pointed to no similar conflict between the testimony of Plaintiff and of his disclosed experts/physicians. (See Docket Entry 30 at 1-3; Docket Entry 31 at 1-5; Docket Entry 36 at 1-9.) That material distinction between the record in Perez and the record in this case renders the good cause ruling in Perez of no value in making a good cause ruling in this case.

Nor does the Court find persuasive Defendant's quotation from Federal Practice and Procedure that, "'if permanent injuries are claimed most courts will, on request, allow an additional examination shortly before the trial.'" (Docket Entry 31 at 4 (quoting 8B Wright et al., supra, § 2234) (internal alteration omitted).) As authority for that broad proposition, Federal Practice and Procedure only cites (and quotes) two half-century-old cases. See 8B Wright et al., supra, § 2234 n.10 (citing and quoting Lewis v. Neighbors Constr. Co., 49 F.R.D. 308, 309 (W.D. Mo. 1969), and Vopelak v. Williams, 42 F.R.D. 387, 389 (N.D. Ohio 1967)). The Court deems those two decisions unhelpful to the

resolution of Defendant's instant Motion, because the discovery landscape has changed dramatically in the intervening five decades.

For example, at the time of the rulings in <u>Lewis</u> and <u>Vopelak</u>, the Federal Rules of Civil Procedure did not "state whether interrogatories . . . as well as requests for inspection . . . impose a 'continuing burden' on the responding party to supplement his answers if he obtains new information." Fed. R. Civ. P. 26 advisory comm.'s note, 1970 amend., subdiv. (e). Similarly, not until 1970 did the Federal Rules of Civil Procedure make clear that, during the discovery process, "[a] party can require one who intends to use [an] expert to state the substance of the testimony that the expert is expected to give." Fed. R. Civ. P. 26 advisory comm.'s note, 1970 amend., subdiv. (b)(4). Moreover, after the decisions in <u>Lewis</u> and <u>Vopelak</u>, roughly a quarter of a century passed before the (previously discussed) disclosure requirements came into the Federal Rules of Civil Procedure. <u>See</u> Fed. R. Civ. P. 26 advisory comm.'s note, 1993 amend., subdiv. (a). Those changes directly impact the analysis of good cause for a physical examination (particularly Defendant's request in this case), as (for reasons outlined above) the disclosure and supplementation provisions of the Federal Rules of Civil Procedure have markedly enhanced "[t]he ability of [Defendant] to obtain the desired information [about Plaintiff's alleged injuries] by other means," <u>Schlagenhauf</u>, 379 U.S. at 118.

In sum, the instant Motion lacks merit, because the record material marshaled by Defendant does not establish a reasonable need for a reappraisal of Plaintiff's alleged injuries and Defendant possessed tools less intrusive than a compelled physical examination to secure information about any developments concerning Plaintiff's alleged injuries.[10]

## CONCLUSION

Under the circumstances presented, the Court does not find the requisite "good cause," Fed. R. Civ. P. 35(a)(2), for the requested physical examination.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Compel Physical Examination of Plaintiff (Docket Entry 30) is **DENIED**.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

February 26, 2019

---

[10] Having so concluded, the Court will not address Plaintiff's alternative "object[ions] to the [requested] exam as untimely as it is outside time limits of the discovery period, [as] . . . prejudicial to [ P]laintiff due to medical testimony having been already secured[,] and finally[ as] . . . lack[ing in] specificity as to the examinations [sic] details" (Docket Entry 35 at 3).